John Fitzgerald HANSON,
Petitioner–Appellant,

v.

William A. SHERROD, Warden, U.S. Penitentiary, USP Pollock, Louisiana; E. Scott Pruitt, Attorney General of Oklahoma, Respondents–Appellees.

No. 13–5100.

United States Court of Appeals, Tenth Circuit.

Aug. 13, 2015.

Sarah M. Jernigan, Assistant Federal Public Defender (T. Kenneth Lee, Assistant Federal Public Defender, and Randy A. Bauman, Assistant Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Oklahoma City, OK, for Petitioner–Appellant.

Robert Whittaker, Assistant Attorney General (E. Scott Pruitt, Attorney General for the State of Oklahoma, with him on the brief) Office of the Attorney General for the State of Oklahoma, Oklahoma City, OK, for Respondents–Appellees.

Before HARTZ, TYMKOVICH, and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge.

This appeal arises out of the murders of Jerald Thurman and Mary Bowles in Tulsa, Oklahoma. At trial, a jury convicted defendant John Hanson for the murder of Mary Bowles with malice aforethought and for the felony murder of Thurman. At the penalty phase, the jury found three aggravating circumstances related to Bowles's murder. Upon the jury's verdict, the trial court sentenced Hanson to death. *See* Okla. St. tit. 22, § 1007 (2015).

On direct appeal, the Oklahoma Court of Criminal Appeals ("OCCA") reversed Hanson's death sentence and remanded for a new sentencing hearing. *Hanson v. State (Hanson I)*, 72 P.3d 40, 55 (Okla.Crim. App.2003). At the resentencing hearing, the jury again sentenced Hanson to death for Bowles's murder. Hanson appealed his sentence to the OCCA, which struck the jury's finding of the great-risk-of-death aggravator but still affirmed his sentence. *Hanson v. State (Hanson II)*, 206 P.3d 1020, 1033, 1036 (Okla.Crim.App.2009).

After the OCCA denied Hanson's application for collateral relief, Hanson filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied the petition, but it granted him a certificate of appealability ("COA") to pursue several arguments before this court. We also granted a COA on all of his remaining issues.

Before us, Hanson argues five general issues. He asserts six instances of ineffective assistance of both trial and appellate counsel and two instances of prosecutorial misconduct. He also argues that we should invalidate his death sentence because the OCCA invalidated the great-risk-of-death aggravator. He also claims there was an error in the jury instruction on mitigating evidence that impermissibly limited the jurors' consideration of mitiga-tion evidence. Finally, he raises cumulative error.

Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253(a), we conclude that none of Hanson's arguments merit relief. Accordingly, we affirm the district court's denial of the habeas petition.

## I. BACKGROUND AND PROCEDURAL HISTORY

The following set of facts detail John Hanson's and Victor Miller's murderous exploits and later crime spree before their eventual arrests. It begins and ends with Mary Bowles, an older woman and volunteer at Saint Francis's hospital, who frequently walked around the Promenade Mall for exercise. On August 31, 1999, Hanson and Miller carjacked Bowles's car, with her in it, from outside the Mall in Tulsa, Oklahoma. *Hanson II*, 206 P.3d at 1025. Hanson, as usual, carried his 9 millimeter semiautomatic pistol, and Miller carried his .38 revolver. *Id.* Miller drove the car, with Hanson and Bowles in the backseat, to an isolated area near a dirt pit that Jerald Thurman owned. *Id.* Thurman was at the pit loading a dump truck with dirt for delivery. *Id.* He was talking to his nephew, James Moseby, on his cell phone when he saw Bowles's car circling in the pit. *Id.* After Thurman and Moseby ended their call, Miller shot Thurman four times with his .38 revolver, including one shot to the head. *Id.* Throughout this time, Bowles remained in the car. *Id.* Moseby arrived at the dirt pit about ten minutes after the phone conversation, where he found Thurman lying on the ground, unconscious, with multiple gunshot wounds. Thurman died from his wounds two weeks later. *Id.*

Meanwhile, Miller drove the car a short distance away from the pit, heading south on what is commonly known as Peanut

Road and told Hanson, "You know what you have to do." *Hanson v. Sherrod* (*Hanson III*), No. 10–CV–0113–CVE–TLW, 2013 WL 3307111, at *8 (N.D.Okla. July 1, 2013) (unpublished). On Peanut Road, Hanson removed Bowles from the car and shot her multiple times with his 9 millimeter semiautomatic pistol. *Hanson II*, 206 P.3d at 1025. Her significantly decomposed body was discovered on September 7, with a bullet in the right side of her chest. The state's forensic pathologist testified that Bowles suffered "without a doubt four and, likely, six" gunshot wounds. The police found two spent cartridges at the scene of Bowles's murder, one .38 special and one 9 millimeter.

After Hanson killed Bowles, Miller and Hanson drove the car a few miles down the road and registered at the Oasis Motel. *Hanson II*, 206 P.3d at 1025. Miller called his wife and asked her to bring him a rag. She complied, and he used the rag to wipe down the inside of the car. Miller and Hanson then abandoned the car at the motel. *Id.* This was not the end of Hanson's and Miller's criminal pursuits.[1]

On September 3, Hanson and Miller robbed Dreamland Video Store at gunpoint. *Hanson III*, 2013 WL 3307111, at *1 (citing *Hanson II*, 206 P.3d at 1025). They entered the store and looked around for a few minutes. Hanson pulled his gun, a 9 millimeter semiautomatic, on one of the store's patrons. He forced the patron to enter a side room and lay face down on the ground. Hanson placed his gun against the patron's back, moved it up to his head, and finally tied the patron's wrists and ankles with duct tape. Next, Hanson removed the patron's wallet from his pants

and placed the barrel of the gun against his neck. Hanson then left the room, shutting the patron inside. Soon afterward, Hanson and Miller fled from the store.

On September 8, a few days later, Hanson and Miller robbed the Tulsa Federal Employees Credit Union at gunpoint. Hanson again carried his 9 millimeter pistol, and Miller carried his .38 revolver. The two men entered the bank and got in line for the bank teller. Stepping up to the counter, Hanson passed the bank teller a note, which read: "Do not panic. Don't hit any buttons. If you do, you will be the first killed. And then the rest will follow in bloodshed. Put all the money in a brown envelope—[manila] envelope." Tr. Trans. II, Vol. VIII at 1618. He also pointed to his weapon so she would know that he was armed. Hanson passed her the envelope, and she filled it with money, including a dollar bill that alerts the FBI and a dye pack. After she handed the envelope back, Hanson and Miller fled the bank.

Finally the next day, law enforcement put an end to Hanson and Miller's armed-felony binge. Miller's wife, Phyllis, had been the driver for their robbery of the credit union. After the robbery, Miller and Phyllis got into an argument, and Miller "tore up" the car. Tr. Trans. I, Vol. IX at 1569. Miller and Hanson then retreated to the Muskogee Econo Lodge, and Phyllis called a "wrecker" to take her back to where she was staying at a Motel 6. *Id.* at 1570. When she arrived, she went to a pay phone and called Crime Stoppers to tell them that she knew who had com-

---

1. On August 23, 1999, just a week before the murders, Hanson and Miller robbed the Apache Liquor Store. Miller approached the counter with a bottle of rum and placed his revolver on the counter. He told the clerk that he wanted all of the money. The clerk handed Miller a bag with the contents from the cash register. Hanson then told another worker to go to the back of the store, and she complied. After this, Miller and Hanson went behind the store counter, rummaged around for a few moments, and then left the store.

mitted the bank robbery. At trial, she testified that she did so because she "didn't want to get in trouble." *Id.* at 1571. The next morning, fearing for her safety, she called Crime Stoppers again to see if they had arrested the men. She explained at trial that, the day before their argument, Miller had pulled a gun on her. She also called because she had more information—she had seen Bowles's car at the Oasis Motel. All told, she told the police where they could locate Hanson and Miller.

Soon after receiving Miller's information, one team of officers went to Bowles's car and lifted Hanson's fingerprint from the driver's side seatbelt, and Miller's fingerprint from the front passenger seatbelt. Another team of officers arrived at the motel to arrest Hanson and Miller. At 6:00 a.m., the "entry team" of police officers went up to the Lodge and "staged up." Tr. Trans. I, Vol. VIII at 1335, 1345. After evacuating all motel rooms except for two, a hostage negotiator called to tell the officers that they had "made contact" with Room 135 and 141 and had demanded that the occupants come out. *Id.* at 1336. In response, an older black male walked out of Room 141. The police took him into custody.[2] About 15 minutes later, Miller came out of Room 135, and the police took him into custody. In contrast, an uncooperative Hanson barricaded himself in Room 135, refusing to communicate or come out.

Throughout the day, an FBI negotiator made four or five approaches to the room, trying to make contact. The police officers would approach the door and "stage outside" Room 135, and the FBI negotiator would yell into the room trying to make contact. *Id.* at 1338. Hanson did not respond to any of these entreaties or the officers' numerous telephone calls. Eventually, the police shut off the water and phone lines to the room. One officer set up surveillance in an adjoining room, Room 137. He heard what sounded like the porcelain lid coming off the toilet and something being dropped inside its tank. At 1:30 p.m., the police finally entered Hanson's room. One officer broke open the door, while another deployed a temporarily debilitating chemical gas agent, CS gas,[3] into the room. After ten or 15 seconds, the gas forced Hanson out of the room.

After taking Hanson into custody, and having already obtained a search warrant, both FBI and state police officers searched Hanson and Miller's room. Inside the toilet tank, the officers found two guns—a .38 caliber revolver and a 9 millimeter semiautomatic pistol. These were the same guns used in the murders of Thurman and Bowles. And they were the same guns used in the robbery of the video store. In the toilet tank, they also found a bag full of live ammunition for the .38 revolver and duct tape. The 9 millimeter pistol was loaded with seven live rounds.

**2.** The record provides no explanation of who this man is or whether he was associated with Miller and Hanson. Chad Farmer, one of the officers who testified at trial and had been on scene at the arrest of Miller and Hanson, said that he never learned the man's identity.

**3.** CS gas stands for 0–chlorobenzalmalononitrile (a form of tear gas), a white solid powder that is typically mixed with a dispersal agent, like methylene chloride, which carries the particles through the air. Physical effects include: burning eyes, involuntary closing of the eyes, tendency to breathe through the mouth, extreme burning in the throat, coughing, consciousness of pain, holding of breath, breathing and heart rate slows down, blood pressure rises, and circulation on the periphery of the body shuts down. WBGH Educational Foundation, *A Primer on CS Gas, Readings*, http://www.pbs.org/wgbh/pages/frontline/waco/csgas.html (last visited June 23, 2015).

The government jointly charged Hanson and Miller with the first-degree murder of Bowles (Count One) and the first-degree murder of Thurman (Count Two). Alternatively, it charged the counts as felony murders. At Miller's request, the trial court severed Hanson and Miller's trials.[4]

At trial, attorneys Jack Gordon and Eric Stall represented Hanson. Rashad Barnes, a former coworker of Hanson's, provided crucial testimony against Hanson in the government's case. Barnes and Hanson had worked together, along with Hanson's cousin Tremaine Wright, at Blue Bell Creameries, where they loaded and unloaded pallets of ice cream. Between February and April 1999, the three men drove together to and from work.

According to Barnes, sometime in late August or early September 1999, he was sitting alone in his backyard. During this general time, Barnes let Hanson live in Barnes's car, which was parked in Barnes's backyard. One day near then, at about 3:00 p.m., Hanson showed up in Barnes's backyard acting "real nervous, real jittery." Tr. Trans. I, Vol. VII at 1157, 1159. Barnes had not seen Hanson for about a week. Barnes described Hanson as "scared" and "terrified," and he recollected that Hanson "kept saying everything went bad." Id. at 1160, 1164.

Barnes testified that Hanson told him that he and Miller had carjacked a car from the Promenade Mall with an old lady in it. According to Barnes, Hanson said that he and Miller put the old lady in the backseat, Hanson got in the backseat with her, and Miller drove them to a back road where they had planned to let her out. Hanson told Barnes that he and Miller had carjacked the car "[t]o do robberies." Id. at 1161.

Continuing with his account, Hanson told Barnes that a man in a dump truck saw them, so Miller got out of the car and shot the man. Judging from Hanson's hand motions, Barnes understood that Miller shot the man in the head and chest. Hanson also told Barnes that the man's body was "smoking." Id. at 1162. As he reloaded his gun, Miller had gotten back into the car and told Hanson, "You know what you have to do." Id. Hanson told Barnes that on the ride back to the road the old lady asked him, "do you have any kids or anyone who [loves you]?" Id. at 1163. Hanson told Barnes that he had told her to shut up and then he punched her. Not far from the dirt pit, Miller stopped the car, and Hanson shot the old lady and concealed her in the bushes. Near the end of the conversation, Hanson said to Barnes, "I hope that none of you all get caught up in this." Id. at 1167. Then he walked away. Barnes did not see him again until trial.

The jury convicted Hanson of first-degree murder of Bowles for Count One, and felony murder of Thurman for Count Two. At sentencing, the jury found three aggravating circumstances under Oklahoma law: (1) that Hanson had a prior conviction for a violent felony; (2) that he knowingly created a great risk of death to more than one person; and (3) that he posed a continuing threat to society. The jury fixed his punishment as death for Count One, and as life imprisonment for Count Two. On May 23, 2001, the court sentenced him to death.

The OCCA affirmed Hanson's murder convictions on appeal, but due to errors at the penalty phase it reversed his death sentence for Count One and remanded for resentencing. Hanson I, 72 P.3d at 45. Just a few days before his resentencing

---

4. The record does not reflect whether Hanson requested that the district court sever their trials as well or whether he contested the severance.

hearing was to begin, Hanson learned of new, possibly exculpatory evidence. A fellow inmate of Miller's attested that Miller had confessed to shooting Bowles. Hanson filed an application for post-conviction relief based on the new evidence. The state district court granted his request for a new trial based on the newly discovered evidence. But the OCCA granted the government's Petition for Writ of Prohibition and reversed the district court's decision, concluding that the district court did not have jurisdiction over Hanson's application. It vacated the new-trial order as void and remanded the case for resentencing.

In January 2006, Hanson's resentencing hearing was finally held. He again was represented by Gordon. By this time, Barnes had been killed in an unrelated incident. *Hanson III*, 2013 WL 3307111, at *8. Thus, the prosecution read Barnes's trial testimony into the record, over Hanson's objections. It also called other witnesses who had testified at the first sentencing hearing. In addition to Hanson's familial witnesses, the defense team called Dr. Jeanne Russell, Ed.D., a licensed psychologist. She had performed a social history and risk assessment on Hanson, and she testified about her findings. A risk assessment is intended to uncover what sort of risk or threat a person may present in a prison setting to other inmates and guards. In this case, it was done in response to the government's allegation of the aggravating circumstance that Hanson was dangerous or a continuing threat to society. Dr. Russell testified that she considered him to be a low risk to society.

At the end of the resentencing hearing, the jury recommended a death sentence for Hanson after finding three aggravating circumstances: (1) Hanson had an earlier felony involving the use or threat of violence; (2) he had knowingly created a great risk of death to more than one person; and (3) he had committed the murder to avoid or prevent a lawful arrest or prosecution. Based upon the jury's recommendation, the court sentenced Hanson to death for Count One, Bowles's murder.

Hanson appealed, and the OCCA invalidated the aggravating circumstance that he had knowingly created a great risk of death to more than one person. *Hanson II*, 206 P.3d at 1033–34. After reweighing the remaining aggravating circumstances against the mitigating ones, it affirmed Hanson's death sentence. *Id.* at 1036. The United States Supreme Court denied certiorari. *Hanson v. Oklahoma*, 558 U.S. 1081, 130 S.Ct. 808, 175 L.Ed.2d 568 (2009).

In 2008, Hanson filed an application for post-conviction relief, which the OCCA denied. After this, Hanson filed a successive application, which was also denied. Then on December 6, 2010, Hanson filed his federal habeas petition with the United States District Court for the Northern District of Oklahoma, raising nine grounds for relief. *Hanson III*, 2013 WL 3307111, at *5. The district court considered his petition and denied relief on all grounds. *Id.* at *40. But it granted Hanson a COA to appeal its decision on some of his claims:

1. Trial counsel provided ineffective assistance by failing to call Ahmod Henry[5] as a witness;

2. Trial counsel provided ineffective assistance by failing to raise all available objections to Barnes's testimony;

---

**5.** Throughout the record and transcripts, Henry's first name is spelled both Ahmad and Ahmod. For consistency here, we use Ahmod.

3. Trial counsel provided ineffective assistance by failing to object to prosecutorial misconduct;

4. Trial counsel provided ineffective assistance by failing to call available mitigating witnesses;

5. Appellate counsel provided ineffective assistance by failing to argue that trial counsel was ineffective for failing to bring forward mitigation evidence of Hanson's mental illness and brain damage; and

6. Appellate counsel provided ineffective assistance by failing to argue that trial counsel was ineffective for failing to challenge the government's failure to specify the predicate crime supporting the avoid-arrest aggravator.

*See id.*

Hanson now appeals, raising the six issues for which the district court granted a COA, as well as an additional three issues that the district court denied:

1. We should invalidate his death sentence because the OCCA invalidated the great-risk-of-death aggravator;

2. The jury instruction on mitigating evidence prevented the jurors from considering and giving effect to all of the mitigating evidence they heard; and

3. The cumulative effect of errors at both stages of trial deprived Hanson of his constitutional rights under the Eighth and Fourteenth Amendments.

We granted COAs on these three additional issues. Consequently, we have jurisdiction to hear all nine claims.

## II. DISCUSSION

■ This court's review of habeas petitions is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, when a state court has considered a claim on the merits, this court may grant a habeas petition only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2) (2015). The AEDPA standard is "highly deferential" and requires that we give "state-court decisions ... the benefit of the doubt." *Littlejohn v. Trammell,* 704 F.3d 817, 824 (10th Cir. 2013) (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)).

■ To analyze a § 2254 claim, we first determine whether the petitioner's claim is based on clearly established federal law, focusing exclusively on Supreme Court decisions. *Hooks v. Workman,* 689 F.3d 1148, 1163 (10th Cir.2012); *Bland v. Sirmons,* 459 F.3d 999, 1009 (10th Cir.2006). If so, then we consider whether the state court's decision was "contrary to" or "an unreasonable application of" that law. *Bland,* 459 F.3d at 1009.

■ If clearly established law exists, a state court decision is "contrary to" it only if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nonetheless arrives at a [different] result." *Id.* (first and second alterations in original) (quoting *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court decision unreasonably applies federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies

that principle to the facts of the prisoner's case." *Id.* (alterations in original) (quoting *Williams,* 529 U.S. at 413, 120 S.Ct. 1495).

 "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter,* 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity." *Id.* (alterations in original). The more general the rule, the more leeway we give to the state courts in reaching decisions on a case-by-case basis. *Id.* When we review a state court's decision, "we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly. Rather, we must be convinced that the application was also objectively unreasonable." *McLuckie v. Abbott,* 337 F.3d 1193, 1197 (10th Cir.2003) (citing *Williams,* 529 U.S. at 412, 120 S.Ct. 1495).

 AEDPA mandates that state court fact findings are presumptively correct and may be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *accord Welch v. Workman,* 639 F.3d 980, 991 (10th Cir.2011). We review the federal district court's conclusions of law de novo and its factual determinations for clear error. *Hooks,* 689 F.3d at 1163 (quoting *McCracken v. Gibson,* 268 F.3d 970, 975 (10th Cir.2001)). When a state court has not considered a claim on the merits, we are "not constrained by the deference principles in § 2254(d)." *Cargle v. Mullin,* 317 F.3d 1196, 1212 (10th Cir.2003).

## A. Ineffective Assistance of Counsel Claims

Hanson argues that his Sixth and Fourteenth Amendment rights were violated by ineffective assistance of counsel at trial and on appeal. He contends that his trial counsel was ineffective for failing to: (1) call Ahmod Henry as a witness in his case-in-chief; (2) raise additional grounds for objecting to the introduction of Barnes's earlier trial testimony; (3) investigate and introduce mitigating evidence at sentencing; and (4) object to prosecutorial misconduct. He asserts that his appellate counsel was ineffective for failing to challenge his trial counsel's ineffectiveness in neglecting to put forth evidence of mental illness and brain damage. Last, he argues that both his trial and appellate counsel were ineffective for failing to argue that the aggravating circumstance for avoiding arrest or prosecution should have been invalidated based on the government's failure to allege a specific crime Hanson sought to avoid by murdering Bowles.

### i. Standard of review for ineffective assistance of counsel claims

 It is undisputed that federal law clearly establishes the right to effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 684, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (recognizing that "the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial" and that the "right to counsel is the right to effective assistance of counsel" (citation and internal quotations omitted)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052.

To prevail on a claim of ineffective assistance of counsel, Hanson must show both that his counsel provided deficient assistance and that the deficiencies prejudiced his defense. *Id.* at 687, 104 S.Ct. 2052. First, to show that his counsel was deficient, Hanson must demonstrate that the errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.; see also Wilson v. Sirmons,* 536 F.3d 1064, 1083 (10th Cir.2008) ("Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, not 'merely wrong.' " (quoting *Hoxsie v. Kerby,* 108 F.3d 1239, 1246 (10th Cir.1997))). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Hooks,* 689 F.3d at 1186 ("[O]ur review of counsel's performance under the first prong of *Strickland* is a 'highly deferential' one." (alteration in original)). Furthermore, we strongly presume that "an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct *might* have been part of a sound trial strategy." *Bullock v. Carver,* 297 F.3d 1036, 1046 (10th Cir.2002) (emphasis in original); *see also Byrd v. Workman,* 645 F.3d 1159, 1168 (10th Cir.2011). We must "judge the reasonableness of counsel's challenged conduct" on the specific facts of the case "viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052; *accord United States v. Challoner,* 583 F.3d 745, 749 (10th Cir.2009).

We afford great deference to trial counsel's strategy but do not allow it to obviate the requirement that counsel perform adequately. *See, e.g., Williams,* 529 U.S. at 396–98, 120 S.Ct. 1495 (holding that trial counsel performed so inadequately as to prejudice the defendant). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington,* 562 U.S. at 101, 131 S.Ct. 770. Where we are applying both the *Strickland* standard and § 2254(d), our review is "doubly" deferential. *Id.* at 105, 131 S.Ct. 770 (citations omitted); *see also Knowles v. Mirzayance,* 556 U.S. 111, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.").

Second, to show that the outcome of his trial was prejudiced by counsel's error, the defendant must show that those "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. To establish prejudice, he must demonstrate "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052; *see also Hooks,* 689 F.3d at 1187. A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. If confidence in either the conviction or the sentence is undermined, prejudice has been established and relief should be granted. *Id.* at 694–95, 104 S.Ct. 2052 (rejecting a preponderance of the evidence standard as too stringent); *accord Byrd,* 645 F.3d at 1168.

Hanson raises six claims of ineffective assistance of counsel. We address each of these arguments in turn.

### ii. Failure to interview and call a witness

Hanson contends that his trial counsel, Gordon, performed deficiently by failing to

call Ahmod Henry in the defense's case-in-chief at the resentencing hearing when Gordon knew that Henry had potentially exculpatory information. Mere days before the resentencing hearing was to occur in 2005, Gordon had learned that back in 2003 Henry had told Detective Michael Nance about a conversation between him and Miller while incarcerated together, in which Miller allegedly confessed to killing Bowles. In this interview, Detective Nance, after establishing that Henry and Miller were in segregation together, asked Henry:

Q: [O.K.] And did you have any conversations with [Miller]?

A: Yeah. Yes.

Q: O.K. What did your conversations consist of?

A: Shit, we was just talking about things that happened in the lifetime, and he started telling me something about some robberies, how he was making money out there, saying he did a lot of robberies, and he ... him and his friend was at a motel, and they got busted, and he said he was running around killing people doing the robbery. He said he killed a bitch. That's all he said, "I killed ... I killed a bitch."

Q: O.K. Did he ... was he anymore [sic] specific about who he killed or ... or ... how he killed her or ... or anything like that?

A: He (inaudible) shot her.

Q: You say he shot her?

A: He killed a bitch.

Q: O.K. Did he ... did he tell you how he shot her or ... A: He didn't say. He just said he killed the bitch.

Q: O.K. Did he tell you who he was with? You said he was with a friend.

A: Yeah, he was with a friend. He never said his friend['s] name. Whoever

the friend was is the one that got caught at the motel with him.

Q: O.K. And is there anymore [sic] information that you know about this that ... that I haven't asked you?

A: No, sir.

O.R. Vol. VII at 1258.

At Hanson's resentencing hearing, Gordon chose not to call Henry as a witness. Instead, he managed in effect to introduce Henry's testimony through his cross-examination of the government's witness, Detective Nance. Detective Nance acknowledged that Henry had told him Miller had confessed to "kill[ing] a bitch." Tr. Trans. II, Vol. VII at 1493. But he quickly disparaged Henry's credibility, characterizing him as a "liar" and as someone who had previously provided unreliable information to the police during his frequent calls to them. Hanson argues that Gordon's failure to put Henry on the stand and present him in a credible manner, or even to interview him before the hearing, was "certainly unreasonable and not [a decision] based on strategy." Appellant's Br. at 21.

The OCCA resolved the issue on deficiency grounds, concluding that counsel had a sound strategy in introducing Henry's testimony through Detective Nance. *Hanson II*, 206 P.3d at 1032. This strategy allowed counsel to present Miller's confession to the jury without the possibility for Henry to be cross-examined. *Id.* The OCCA stated that "[a]rguably this was the best of all possibilities for Hanson since Henry had credibility problems and was known for being unreliable. Defense counsel made a sound strategy decision not to call Henry...." *Id.* We cannot say that the OCCA improperly applied *Strickland* in determining that Gordon operated under sound strategy. The district court agreed with the OCCA. *Hanson III*, 2013 WL 3307111, at *30–31.

We begin with the presumption that Gordon had a sound trial strategy when he decided not to call Henry as a witness. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Gordon himself reinforced this presumption. Outside the presence of the jury, in support of his right to question Detective Nance about the conversation, Gordon explained to the presiding judge that he did not want to question Henry directly because "I don't know whether Ahmod Henry [will invoke his Fifth Amendment right]—there's no telling what he'll do. He's a long-time crook and known for getting funny notions." Tr. Trans. II, Vol. VII at 1468. Gordon's comment demonstrates his own concern regarding Henry's credibility and provides a reasonable explanation for why he did not call Henry as a witness. We deem this to be sound trial strategy under *Strickland's* deferential standard. *See, e.g., Harrington*, 562 U.S. at 108–09, 131 S.Ct. 770 (concluding that an attorney's decision not to pursue expert blood testimony was a sound strategy under deferential *Strickland* standard because such testimony could have had negative consequences for the defense); *United States v. Orozco*, 301 Fed.Appx. 783, 785 (10th Cir.2008) (unpublished) (concluding that an attorney was not deficient for failing to call potentially exculpating witness because his credibility could taint the exculpating evidence introduced on direct examination).

Depending on what Henry told him, it is possible that Gordon might have provided better counsel had he thoroughly interviewed Henry before deciding against eliciting the testimony directly from him. But this is far from certain, and even had it worked out that way, Gordon's failure to do so hardly meets *Strickland's* deficiency standard. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *accord Romano v. Gibson*, 278 F.3d 1145, 1154 (10th Cir. 2002). When we consider Gordon's perspective at the time of his decision, we believe it made sense for him to decide not to call Henry on direct examination for fear of what Henry might say.

Because we hold that Gordon was not deficient by failing to call Henry in his case-in-chief, we do not consider prejudice. Thus, we affirm the district court's holding on this issue.

### iii. Failure to raise all available grounds for impeachment of witness's testimony

Hanson next asserts that Gordon provided ineffective counsel by failing to object to the introduction of Barnes's trial testimony at the resentencing hearing based on Miller's testimony at his own trial. Because Barnes was deceased by the time of the resentencing hearing, the transcript of his trial testimony was read into the record. Gordon argued vigorously that the newly discovered evidence—Henry's statement—should prevent the admission of Barnes's testimony, but he did not mention Miller's trial testimony specifically as a separate ground for objection. In fact, Gordon had never read the transcript from Miller's trial. Because Barnes's testimony was the only direct evidence identifying Hanson as Bowles's shooter, Hanson argues that his counsel was ineffective for failing to raise every possible objection to the testimony. Thus, the question is whether Gordon's failure to read Miller's trial transcript was such serious error as to render his performance completely unreasonable. *See Wilson*, 536 F.3d at 1083.

And if so, whether that deficiency prejudiced the outcome of Hanson's trial. *See id.*

The OCCA concluded that Gordon had not been deficient because his decision not to present evidence from Miller's trial testimony "appears reasonable and strategic." *Hanson II,* 206 P.3d at 1032. It found that there were "sound reasons to shield Hanson's jury from evidence of Miller's trial testimony," including: (1). "that Miller's testimony inculpated Hanson"; and (2) "that Miller's testimony exculpating himself and implicating Barnes was refuted by objective facts." *Id.* at 1027. Among the objective facts were these: (1) Hanson and Miller's fingerprints, not Barnes's, were found in Bowles's car; and (2) Hanson and Miller robbed the liquor store, the video store, and the credit union, and they were arrested in Muskogee with the firearms used to kill Thurman and Bowles. *Id.* at 1027 n. 12. The district court agreed. *Hanson III,* 2013 WL 3307111, at *32.

 It is well established that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. First, we tackle the question of whether Gordon's failure to read Miller's trial transcript was error. Gordon admits that he never read Miller's trial transcript, which means he was unaware of any potential benefits the transcript might provide. But we have trouble accepting Hanson's proposition that this omission constitutes deficient performance. The Supreme Court has recognized that "when counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct.

2052). Gordon already had grounds for objecting to the introduction of Barnes's testimony: Henry's exculpatory statement to Detective Nance regarding Miller's confession. The "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Id.* (citing *Bell v. Cone,* 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)). Thus, we do not think this omission satisfies *Strickland's* notion of deficient performance.

 Yet even if we were to reach prejudice, Hanson's argument would still fail. He emphasizes that Miller's trial contained evidence that Barnes was friends with Miller. For instance, Miller testified that he had been to Barnes's house several times, that the weapons used in the robbery belonged to Barnes and were kept in his house, and even that Barnes participated in the homicides. *Miller v. State,* 98 P.3d 738, 742 & n. 11 (Okla.Crim.App.2004). But these potentially useful scraps of evidence are undermined and countered by other disadvantageous components of Miller's testimony, such as the inconvenient truth that Hanson and Miller were later caught committing other crimes with the same firearms used in the murders of Thurman and Bowles.

As such, Hanson is unable to demonstrate that there is a "probability sufficient to undermine confidence in the outcome" of his trial. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. We hold that even if counsel erred by not reading Miller's trial transcript, such error did not prejudice the outcome of Hanson's case because Barnes's trial testimony would have been admitted regardless. We affirm the district court's ruling on this issue.

### iv. Failure to investigate and present mitigating evidence

 Hanson next argues that his trial counsel was ineffective because he failed to

investigate and present available mitigating witnesses, thereby failing to create a compelling and complete story for the jury. Gordon called one expert witness to rebut the continuing-threat aggravator. He also called four lay witnesses on Hanson's behalf: his ten-year-old son Marquelle, his ex-girlfriend, his ex-girlfriend's brother, and his ex-girlfriend's niece.

As part of his application for post-conviction relief, Hanson submitted to the OCCA the affidavits of 13 additional mitigating witnesses, who claim that they would have testified at his resentencing hearing if asked. A few of the witnesses even expressed indignation at not being given the opportunity to testify. Hanson contends these witnesses would have painted a fuller picture for the jury. After reviewing the new affidavits, the OCCA rejected this claim. *Hanson II*, 206 P.3d at 1032. It concluded that the new character evidence was substantially similar to the testimony already provided at the resentencing trial, and so it was not "persuaded that presenting additional character evidence of the same type would have changed the outcome of the trial." *Id.* After conducting its own review, the district court agreed, explaining that "[t]his is not a case where trial counsel did not investigate or present appropriate mitigating evidence." *Hanson III*, 2013 WL 3307111, at *34. Moreover, it found the additional evidence "somewhat duplicative, and of marginal value." *Id.* at *36.

■■■ In the case of mitigating evidence, the Sixth Amendment imposes a duty on counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. Even under AEDPA's deferential standard, "we are ... conscious of the overwhelming importance of the role mitigation evidence plays in the just impo-

sition of the death penalty." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000). Because of the enormous stakes confronted in a capital case, this court has stated that we must ensure that "the sentencing jury makes an individualized decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics,' and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." *Id.* (quoting *Lockett v. Ohio*, 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). Even amidst this backdrop, we do not think that Gordon committed error by failing to present the additional mitigating witnesses because the content was duplicative.

We begin by reviewing the mitigating evidence that Gordon actually presented at the resentencing hearing. He called four mitigating witnesses who provided testimony to the effect that Hanson was a kind, loving, and hard-working person, and a good father:

- Tenika Simmons, Hanson's ex-girlfriend's niece, testified that Hanson helped her to get through some dark times in her life and talked her out of committing suicide. She described Hanson as a "good father," Tr. Trans. II, Vol. X at 1781, and as a nonviolent person.

- Eric Knowles, Hanson's ex-girlfriend's brother and a coworker of Hanson's for some time, testified that Hanson was a "good worker" who "worked his butt off." *Id.* at 1787. He said Hanson was neither violent nor aggressive. He shed light on how difficult the death of Hanson's father was on him, explaining that his father's death "really shook his world up." *Id.* at 1790. He characterized him as "a follower" who required direction and structure. *Id.* at 1791.

- Ledocia Warrior, Hanson's ex-girl-friend of four years, testified that Hanson was a "very caring and loving person ... [who] never showed any signs of anger." *Id.* at 1803. She described their son Marquelle as the most important person in Hanson's life and explained that Hanson and Marquelle have "a very loving communication." *Id.* at 1808.

- Marquelle Hanson, Hanson's son, testified that he has a "pretty good relationship" with his father and that he looks forward to his father's letters from prison. *Id.* at 1810, 1813.

As the district court noted, trial counsel investigated and presented mitigating evidence. But Hanson maintains that this testimony was insufficient to "humanize" him. Appellant's Br. at 34. He submitted 13 affidavits from family members and friends who, he argues, would have humanized him in the eyes of the jury. These included:

- Charlotte Ward, Hanson's mother, who would have testified that Hanson was a "good boy" who "just got in with the wrong people and their influence." Application for Evidentiary Hearing on Sixth Amendment Claim, Case No. D–2006–126, at 18. She would have explained that he was an "excellent father" and a thoughtful and kind son. *Id.*

- Stephen Hanson, John Hanson's brother, who would have testified that their father's death was extremely hard on Hanson, causing him to feel like his "world had ended." *Id.* at 21. He would have testified that Hanson was a "good person" and a hard worker. *Id.*

- Charmyn Clariett, Hanson's younger sister, who would have testified that Hanson was a "loving, caring person"

whose son adores him and that his "son is his life." *Id.* at 24.

- Marsha Hollingsworth, Hanson's cousin, who would have testified that she helped to raise Hanson. She would have stated that the death of Hanson's father was hard on Hanson and that Hanson "didn't know how to live without him." *Id.* at 26.

- Joyce Leake, Marquelle's grandmother, who would have testified that Hanson "took awfully good care of" his son. *Id.* at 28. He "was a very nice young man and so respectful to me." *Id.*

- Spencer Knowles, Marquelle's uncle, who would have testified that he has known Hanson for ten to fifteen years and that Hanson "was a good father to his son," "cared about his family," and was a generous, "good-souled" person, always there to help. *Id.* at 30.

- Theresa Simmons, Hanson's ex-sister-in-law, who would have testified that Hanson was reliable, "kind[,] and caring." When Simmons was going through a divorce, Hanson was "there for" her daughter. *Id.* at 32.

- Melissa Simmons, Hanson's ex-niece, who would have testified that Hanson was "always nice" to her, that he was "always cooking and cleaning" at their house, and that he looked after his son well. *Id.* at 34.

- Marilyn Wright, Hanson's mother's best friend, who would have testified that Hanson was a "loving person, nice[,] and respectful" and that he was helpful and kind. *Id.* at 36.

- Tremaine Wright, Hanson's good friend and roommate for eight years, who would have testified that Hanson missed his dad a lot, that he was a "good father[,]" but that Miller was a bad influence on him. *Id.* at 39–41.

- Jermaine Wright, Hanson's childhood friend, who would have testified that Hanson was a "very respectable guy"; that he was hard working and helpful; that he loved his son more than anything; and that he was a "good father." *Id.* at 43.
- Jamarro Wright, Hanson's childhood friend, who would have testified that Hanson was a family man, who was good with kids and a good father.
- Daron Joseph, Hanson's friend, who would have testified that Hanson had strong "family values," was a good father, and was "kind-hearted"; and that he was someone who "respects people." *Id.* at 48–50.

We acknowledge that we would be concerned had Gordon never investigated or spoken with any of Hanson's close family members. *See Wilson,* 536 F.3d at 1087 (concluding that counsel was deficient for failing to interview a single family member). The record does not reveal whether Gordon actually interviewed, or attempted to interview, these family members. But we need not face this dilemma because we believe that Hanson was not prejudiced by Gordon's failure to present these witnesses at trial.

Even if Hanson had met the first *Strickland* prong, he could not show that he was prejudiced by the deficient performance. He contends that the additional witnesses would have provided "unique viewpoints of who John Hanson is and offered necessary narratives of the events that transformed [his] life." Appellant's Br. at 30. But we are not persuaded. After comparing the mitigating evidence that was actually presented with the proffered affidavits, we see that the additional mitigating witnesses would have testified to the same themes as the four testifying witnesses: Hanson is a follower; he is a kind and nonviolent person; and he is a good father. This testi-

mony would have been duplicative and thus of only marginal value. *See Hooks,* 689 F.3d at 1190 (concluding that counsel was not deficient in failing to call a witness because jury may have found that her testimony was "duplicative"); *DeRosa v. Workman,* 679 F.3d 1196, 1218–19 (10th Cir.2012) (concluding that counsel was not deficient in failing to present additional mitigating evidence because it was in large part "duplicative" of evidence actually presented at trial and so of only marginal value). Many of our cases have refused to find prejudice when the evidence not presented would have been cumulative of the evidence the jury already heard. *See Grant v. Trammell,* 727 F.3d 1006, 1022 (10th Cir.2013) (listing cases).

We conclude that there is not a reasonable probability that the additional mitigating evidence would have impacted the jury's ultimate decision. We cannot say it was unreasonable for the OCCA to hold that it would not have changed the outcome of Hanson's trial. Therefore, we affirm the district court's denial of habeas relief on this claim.

#### v. Failure to present evidence of mental illness and brain damage

Hanson next argues that both his trial and appellate counsel provided ineffective assistance by failing at the resentencing hearing and on appeal to properly investigate and present evidence concerning Hanson's mental-health issues and possible brain damage. He relies on the report prepared by psychologist Dr. Jeanne Russell, Ed.D., for his resentencing hearing, which, he says, flagged multiple indicators of his mental-health issues. He asserts that this evidence, in conjunction with reports prepared by a psychiatrist and neuropsychologist at the habeas stage, would have provided the jury with a fuller picture

of Hanson's mental health status and helped to explain his actions. He believes these reports provide sufficient evidence of his mental-health issues to warrant our reversal of his sentence or, at the very least, to warrant a remand with instructions for the district court to hold an evidentiary hearing on the matter. Before engaging in an analysis of the issue, we present the various evaluations that were conducted both before and after the resentencing hearing. We then examine and explain why we are unconvinced by Hanson's argument and reject his request for an evidentiary hearing.

Before the 2001 trial, Kathy LaFortune, an in-house psychologist for the Oklahoma Indigent Defense System ("OIDS"), conducted a preliminary screening examination of Hanson. This screening consisted of a basic mental health examination, a Minnesota Multiphasic Personality Inventory, and an abbreviated IQ test. LaFortune opined that, based on her examination, a neuropsychologist should not be retained.

After the OCCA remanded the case for a new sentencing hearing, Gordon referred Hanson to Dr. Russell, for a social history and risk assessment. Dr. Russell was hired specifically to rebut the continuing-threat aggravator by providing information on Hanson's background and potential risk for violence while incarcerated. Dr. Russell (1) performed a Minnesota Multiphasic Personality Inventory, a Weschler Abbreviated Scale of Intelligence test, and a Hare Psychopathy Checklist test; (2) interviewed Hanson, his mother, stepfather, and ex-girlfriend; and (3) reviewed various legal documents, including his presentence report and Oklahoma Department of Correction Records.

Her report unearthed numerous aspects of Hanson's background and mental health. Hanson's parents divorced when he was ten years old and his father died when he was 17. He dropped out of high school after eleventh grade, completing his GED in prison. Dr. Russell observed that Hanson exhibits paranoid thoughts, which impair his ability to trust anyone. The Minnesota Multiphasic Personality Inventory "indicates some confusion and personality deterioration. . . . [H]e is preoccupied with bizarre ideas and abstract thoughts. He tends to project blame onto others and appears to withdraw into fantasy in an attempt to deal with his distress." Appendix of Attachments to the Successive Application for Post–Conviction Relief in OCCA case no. PCD–2011–58, Att. 7, at 7. She also observed that his "extreme and bizarre thoughts[ ] suggest[ ] the presence of delusions and/or hallucinations. He apparently believes that he has special mystical powers or a special 'mission' in life that others do not understand or accept." *Id.* In conclusion, her psychological testing results showed that his overall intelligence is above average, that he is depressed, and that he feels "estranged and alienated from people and is suspicious of the actions of others." *Id.* at 12. At the resentencing hearing, she testified that he was a "low risk to society" in prison. Tr. Trans. II, Vol. X at 1758.

On direct appeal of his second death sentence, Hanson's new counsel, Jamie Pybas, attempted to retain a neuropsychologist to examine Hanson. But after LaFortune advised her not to retain one, Pybas abandoned all pursuits.

In preparation for his federal habeas petition, Hanson's new counsel, Robert Jackson, procured a psychiatric evaluation and a neuropsychological evaluation. Hanson submitted reports from these evaluations with his second post-conviction application before the OCCA. The OCCA denied his post-conviction relief, finding his ineffective assistance of counsel claim mer-

itless. The OCCA reviewed and acknowledged the evidence Hanson had provided in support of his mental health claims, stating:

Hanson provides in support of his current application for relief the January 13, 2011 affidavit of Tora Brawley, Ph. D., and Hanson's November 29, 2010 psychiatric evaluation conducted by Dr. Donna Schwartz–Watts, M.D. Dr. Brawley conducted a neuropsychological evaluation of Hanson in December 2010 that included a clinical interview, behavior observation and the administration of a battery of standardized tests. Dr. Brawley states that her evaluation revealed the presence of scattered cognitive deficits suggestive of brain organicity. She believes these deficits were present at the time of the murder because there is no evidence Hanson suffered any trauma since that time to account for these deficits. She states that scores on testing conducted in 2004 should have led to further evaluation of Hanson's neuropsychological and neurological functioning. Findings of brain organicity, according to Dr. Brawley, can be an important aspect contributing to criminal behaviors and should have been considered in Hanson's defense during legal proceedings. Dr. Schwartz–Watts concludes that Hanson suffers from Dysthymic Disorder, Major Depressive Disorder, Post Traumatic Stress Disorder, Cognitive Disorder[,] and Paranoid Personality Disorder. Her opinions are consistent with those of Dr. Brawley.

Opinion Denying Second Application for Post–Conviction Relief and Motion for Evidentiary Hearing, PCD–2011–58, Appellant's Br., Att. I at 7, n. 5. In support of its opinion denying relief, the OCCA stated:

According to the materials, Hanson was evaluated early on by the Head of Psy-

chological Services at OIDS at the request of trial counsel, presumably to evaluate the need for psychological experts. After the screening procedure, a psychologist was retained to perform a risk assessment for Hanson's original trial. Appellate counsel's request for a neuropsychologist during Hanson's direct appeal of his original trial was denied based upon the screening examination conducted before trial. We can only conclude that his screening examination did not suggest the need for neuropsychological testing for mental illness and cognitive dysfunction. For Hanson's resentencing trial, a second risk assessment was performed by another psychologist. There is no evidence before us that either of the psychologists who performed risk assessments of Hanson expressed any concerns to Hanson's attorneys—as one would think this type of expert would do in a case like this— that Hanson needed further evaluation because their testing revealed indicators of mental health or cognitive dysfunction. *We cannot accept as credible Hanson's assertion that the experienced capital litigation experts and attorneys all missed these obvious indicators of mental illness and cognitive dysfunction in this case at every step.* Instead, we think the record shows that the issue of Hanson's mental health was considered by trial and appellate counsel and they decided not to pursue further mental health investigation in light of the screening test results. This was a reasonable strategy decision under the circumstances.

*Id.* at 5–6 (emphasis added).

Because the OCCA reviewed the new evidence, the district court properly analyzed the claim through the lens of AEDPA. *Hanson III*, 2013 WL 3307111, at *37. It affirmed the OCCA's holding and agreed with its reasoning that "appellate

counsel did not perform deficiently because pretrial mental and social evaluations of [Hanson] did not reveal a need for further evaluation." *Id.* at *38. It also concluded that Hanson "was not prejudiced by trial counsel's failure to further investigate and present evidence of [Hanson's] mental health issues." *Id.* at *39. We agree and hold that neither trial nor appellate counsel was deficient in their investigation and presentation of Hanson's mental-health issues.

As in his previous ineffective assistance of counsel claims, Hanson here must establish both that his attorney's representation was deficient and that the deficient performance prejudiced his defense. *See Hooper v. Mullin,* 314 F.3d 1162, 1168–69 (10th Cir.2002). The Supreme Court has expressly held that evidence of mental illness and brain dysfunction are essential components of a defendant's mitigation case. *Boyde v. California,* 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) ("[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to . . . emotional and mental problems, may be less culpable than defendants who have no excuse." (internal quotation marks omitted)); *see also Sears v. Upton,* 561 U.S. 945, 956, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010) (per curiam) (concluding that trial counsel's utter failure to uncover evidence of petitioner's significant mental and psychological impairments was deficient and prejudicial). Mental-health evidence in particular is some of the most valuable mitigating evidence available. *See Anderson v. Sirmons,* 476 F.3d 1131, 1144 (10th Cir.2007) (stating that mental health evidence can show that what is going on in

a defendant is not necessarily the "meanness" jurors assume).

Hanson argues that counsel did not have a strategic reason for failing to investigate the possible mental-health issues flagged in Dr. Russell's report. "Instead of exploring these markers, counsel simply forged ahead with the lone approach of rebutting the continuing threat aggravator." Appellant's Br. at 44. While the OCCA and the district court found that the pretrial mental health evaluations revealed no reason for further testing, Hanson attributes this to the limited evaluations. We are surprised by his argument. His assertion flies in the face of his contemporaneous argument that Dr. Russell's report flagged multiple indicators of mental-health issues that trial and appellate counsel should have followed up on. He cannot simultaneously contend that the tests were too narrow to reveal his mental health issues *and* that they raised red flags requiring counsel's follow-up. Those arguments are intrinsically contradictory.

■ Moreover, studied through the lens of AEDPA's deference, we do not see how we could disagree with the OCCA's finding that "we cannot accept as credible Hanson's assertion that the experienced capital litigation experts and attorneys all missed these obvious indicators of mental health illness and cognitive dysfunction in this case at every step." Appellant's Br., Att. I. at 5–6. Hanson received at least two different mental health screenings or evaluations before his resentencing hearing. The evaluations alerted neither the psychologist nor the attorneys to flags indicating Hanson might have mental-health problems. We cannot simply assume that every single member of the defense team missed glaring markers of Hanson's mental illness.[6]

---

6. Hanson also contends that both the OCCA and the district court failed to acknowledge

that LaFortune's role at both the trial and appellate level caused his appellate counsel to

■ Finally, we refuse Hanson's request to remand the case to the district court for an evidentiary hearing on this issue. A habeas petitioner can obtain an evidentiary hearing in federal court by "(1) showing he was diligent in developing the factual basis for his claim in state court . . .; and (2) asserting a factual basis that, if true, would entitle him to habeas relief." *Boyle v. McKune*, 544 F.3d 1132, 1135 (10th Cir.2008) (citations omitted). If the petitioner has exercised diligence in developing the factual basis for his claim, "his request for an evidentiary hearing may be assessed under less-rigorous pre-AEDPA standards." *Littlejohn*, 704 F.3d at 857; *see also Williams*, 529 U.S. at 437, 120 S.Ct. 1479.

■ The preliminary inquiry is whether Hanson was "diligent" in developing the factual basis for his claim. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437, 120 S.Ct. 1479. Hanson sought to develop his claim in state court. As such, we believe Hanson was diligent in developing the factual basis for his claim.

Moving on to the substantive inquiry, we must consider whether Hanson is entitled to an evidentiary hearing on his claim. He

is entitled to a hearing so long as his factual allegations, "if true, would entitle [him] to federal habeas relief." *Boyle*, 544 F.3d at 1136 (alteration in original) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)). But he has offered no evidence that his counsel was deficient in relying on the evaluations of two psychological experts, neither of which suggested further testing. Therefore, we deny his request for an evidentiary hearing.

### vi. Failure to object to prosecutorial misconduct

Hanson next argues that there were numerous instances of prosecutorial misconduct to which Gordon failed to object, rendering his counsel ineffective. He contends that the prosecution: (1) inappropriately vouched for Barnes's credibility; (2) made improper appeals for civic justice; (3) misled the jury about the proof necessary to establish the great-risk-of-death aggravator; (4) engaged in name-calling; and (5) improperly invoked sympathy for the victim. The OCCA held that counsel's lack of objections did not prejudice Hanson in any respect because the outcome of his trial would not have been different.[7] *Hanson II*, 206 P.3d at 1032.

---

lose their independence, resulting in his appellate counsel providing ineffective assistance. His appellate attorney did not retain a new expert for a mental-health evaluation because LaFortune, the "gatekeeper" for approval of expert funds at OIDS, rejected funds for Hanson's neuropsychological testing because she had already conducted a screening herself before Hanson's original trial. Appellate counsel decided not to pursue it further. Hanson contends that this was error, not a decision based on strategy.

Hanson cannot succeed on this claim because there is no clearly established federal law on point. He submits *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), for the proposition that

the Supreme Court has recognized the detrimental effect when trial and appellate counsel are not independent. But *Kimmelman* does not apply here because Hanson's trial and appellate counsel were independent. Hanson's problem is with LaFortune and her role at both the trial and appellate level. And in any event, two different and independent experts evaluated Hanson before his resentencing—Dr. LaFortune and Dr. Russell—and neither suggested a need for any further evaluation. In that circumstance, it was not ineffective assistance for Hanson's counsel not to seek an additional evaluation.

7. Hanson challenges the legal standard the OCCA applied in making this determination. In finding that Hanson was not prejudiced by

■ We begin by noting that before Hanson can succeed on his counsel's failure-to-object claims, he must show that the underlying prosecutorial-misconduct claims themselves have merit. *Neill v. Gibson*, 278 F.3d 1044, 1058, 1062 (10th Cir.2001); *see also Werts v. Vaughn*, 228 F.3d 178, 205 (3d Cir.2000) (concluding that trial counsel's performance cannot be ineffective for failing to object to the prosecutor's proper remarks). We conclude that none of Hanson's underlying prosecutorial-misconduct claims have merit. As such, we do not engage in an analysis of whether his counsel was ineffective for failing to object to them.

### a. *Inappropriate vouching*

■ First, Hanson claims that the prosecution "unfairly bolstered" Barnes's credibility. Appellant's Br. at 62. During the closing argument at trial, the prosecutor argued as follows:

> The instructions tell you to consider the credibility of the witness[ ].... What stakes does Rashad have in this? None. For his testimony he's labeled a snitch. He told you he was scared to testify. He has nothing in this except to tell what he knows of what happened and what that defendant told him.

Tr. Trans. I, Vol. X at 1723–24. The prosecutor also argued that "[Barnes] became the third victim in all this.... He's out there in north Tulsa with the label of snitch around his neck and with them trying to convince you he was involved." *Id.* at 1747. At the closing argument during

Hanson's resentencing hearing, the prosecutor stated, "Rashad Barnes doesn't have a criminal history. [He] hasn't been impeached. [He] hasn't been shown to tell a lie. None of that stuff. They have previous transcripts. You've heard the previous transcript. Rashad has consistently told the truth and has never been impeached. [His] story is corroborated at every angle." Tr. Trans. II, Vol. XI at 1902–03. Hanson contends that these statements constitute "impermissible vouching," which was used to ensure that the jury found Barnes credible. Appellant's Br. at 62–63. Correspondingly, he argues his trial counsel was ineffective for failing to object.

■ The OCCA rejected Hanson's argument because a prosecutor's discussion of a witness's credibility is not per se vouching. *Hanson I*, 72 P.3d at 50 n. 28. We agree. "[I]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." *United States v. Young*, 470 U.S. 1, 8, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (alteration in original) (quoting ABA Standards for Criminal Justice 3–5.8(b) (2d ed.1980)). Impermissible vouching occurs when "the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *United States v. Harlow*, 444

counsel's failure to object to the alleged prosecutorial misconduct, the OCCA stated, "[Hanson] cannot show that the outcome of his resentencing trial would have been different had counsel objected." *Hanson II*, 206 P.3d at 1032. Hanson argues the law does not require him to affirmatively show that the outcome of his trial would be different, but only to demonstrate a reasonable probability

that the outcome would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Whether Hanson is correct is irrelevant because we never reach the *Strickland* inquiry. Our analysis stops short of that question because of our conclusion that the prosecution did not engage in any misconduct in the first place.

F.3d 1255, 1262 (10th Cir.2006) (quoting *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir.1990)).

That is not the case here. In *United States v. Jones*, 468 F.3d 704, 707 (10th Cir.2006), we held that "presenting evidence of [the witness's] obligation or motivation to testify truthfully is unobjectionable." *See also Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir.2005) (concluding that "it is not improper for a prosecutor to direct the jury's attention to evidence that tends to enhance or diminish a witness's credibility"). The prosecutor here did just that. What he did not do, and what would be impermissible, is to give his own opinion on Barnes's credibility or to suggest that he knew something more about Barnes's credibility than could be deduced from the evidence at trial. Instead, the prosecutor directed the jury's attention to concrete evidence supporting Barnes's credibility. There is no rule against that. Thus, the underlying claim of prosecutorial misconduct cannot stand, and so trial counsel was not wrong for failing to object.

### b. *Improper appeal for civic justice*

 Hanson next argues that trial counsel erred by failing to object to the prosecutor's inappropriate comments giving the jury a choice between sentencing Hanson to death and abandoning its civic duty. During resentencing, the prosecutor told the jury, "[M]ake this about truth, make this about accountability, and make this about justice." Tr. Trans. II, Vol. XI at 1834. Later, he said:

[L]adies and gentlemen [you] are going to write the final chapter. I want to ask you, is it going to be about justice? Is it going to be about accountability? ... when you knock on that door ... you're going to be telling this court what jus-

tice is about in this case. You will be doing that, you twelve.

*Id.* at 1865–66.

 We do not view these comments as an improper appeal for civic justice and disagree with Hanson's characterization of the prosecutor's two statements. While "[i]t is improper for a prosecutor to suggest that a jury has a civic duty to convict[,]" that is not the situation here. *Wilson*, 536 F.3d at 1120; *see also Thornburg*, 422 F.3d at 1134.

Hanson submits *Viereck v. United States*, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), in support of his argument that the prosecutor's statements essentially forced the jurors to impose the death penalty to fulfill their duty. But after reviewing *Viereck*, we think that if anything it undermines Hanson's argument. In *Viereck*, the prosecutor exceeded permissible bounds by arguing during closing as follows:

This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

*Id.* at 247 n. 3, 63 S.Ct. 561. The Court concluded that, because of the United States' participation in World War II at the time of trial, the prosecutor's language heightened the jury's emotions in a highly prejudicial way. *Id.* at 248, 63 S.Ct. 561.

We find no such arousals of passions or emotions here. Rather, we agree with the government that "the prosecutor merely expressed the solemnity of the jury's responsibility as the final arbiter of justice...." Appellee's Br. at 43.

 Hanson replies by directing us to consider the prosecutor's statement in the

context of the government's overarching request for the death penalty. He suggests that when we think about the prosecutor asking the jury to tell the court "what justice is about in this case," Tr. Trans. II, Vol. XI at 1865–66, on the heels of his telling the jury that this case is one fit for a death sentence, we will agree with him. But we do not. In advocating for a just result, the prosecutor emphasized that "[y]ou twelve jurors decide" where the line is drawn. *Id.* at 1864. "References to 'justice' are not necessarily improper, at least where the 'prosecutor's comments [are] firmly rooted in *the facts of the case*' and are not otherwise made in a substantially inflammatory manner." *Littlejohn,* 704 F.3d at 842 (emphasis and alterations in original) (quoting *Thornburg,* 422 F.3d at 1134). The government did not encourage the jury to throw away reason when making its decision. It merely highlighted the importance of that decision.

Because the underlying claim of prosecutorial misconduct fails, counsel was not deficient in failing to object to it.

### c. The great-risk-of-death aggravator

■ Hanson next argues that the prosecutor misstated the law on the great-risk-of-death aggravating circumstance.[8] He cites the prosecutor's statement that because Thurman and Bowles were killed within minutes of each other there was "[n]o question that [Hanson] created a risk of death to more than one person," Tr. Trans. II, Vol. XI at 1854, and to the prosecutor's argument that "[t]he aggravating circumstance[ ] has been met. . . . We've alleged great risk of death to more than one person. There [are] two people dead." *Id.* at 1908. The OCCA found the claim moot in light of its invalidation of

this aggravating circumstance on the grounds that it was not supported by sufficient evidence. *Hanson II,* 206 P.3d at 1032–34. Thus, it found that these comments "did not render Hanson's resentencing trial unfair." *Id.* at 1034.

■ Because the OCCA invalidated the aggravating circumstance, we agree that this claim is moot. When a death sentence is based in part on an invalid aggravator, the state trial or appellate court may uphold the sentence by reweighing the aggravating and mitigating evidence. *Clemons v. Miss.,* 494 U.S. 738, 741, 748–49, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *see also Turrentine v. Mullin,* 390 F.3d 1181, 1203 (10th Cir.2004). In this case, the OCCA first determined that the great-risk-of-death aggravator had been improperly applied. *Hanson II,* 206 P.3d at 1033. Following this conclusion, it reweighed the remaining aggravating circumstances against the mitigating ones and found that they still supported the death penalty. *Id.* at 1034. The court also said that "[t]he evidence offered in support of the invalidated aggravating circumstance—that Hanson knowingly created a great risk of death to more than one person—was equally relevant to prove that he murdered Bowles to avoid arrest." *Id.* at 1036; *see infra* Part II.C for further discussion. Hanson does not demonstrate how the OCCA's decision was contrary to, or an unreasonable application of, clearly established federal law, and we do not see how the OCCA deviated from the law. Therefore, counsel was not deficient for failing to object.

### d. Name-calling

■ Hanson also argues that his trial counsel was deficient in failing to

---

8. Title 21, section 701.12(2) of the Oklahoma statutes provides that an aggravating circumstance includes a finding that the "defendant knowingly created a great risk of death to more than one person."

object to the prosecution repeatedly calling Hanson names, which Hanson contends was intended to garner sympathy for the victim. During trial, the prosecution called him "a two-time, cold-blooded killer" and a "murderer," and they compared him to a "jackal." Tr. Trans. I, Vol. X at 1744, 1746, 1749. While the OCCA recognized that name-calling is disfavored, it found that the evidence showed that Hanson was a carjacker who carried a gun and had committed at least one murder. *Hanson I*, 72 P.3d at 50. Thus, the name-calling was grounded in the record.

The district court agreed that there was sufficient evidence to support the comments in this case. *Hanson III*, 2013 WL 3307111, at *11. It also concluded that the comments did not deny Hanson his right to due process because there was ample support for the jury's verdict of guilt. *Id.; see Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir.2005) (finding no constitutional error when prosecutor called defendant "evil" and a "monster" because of the strength of the prosecutor's case and the fact that the majority of the prosecutor's argument was based on evidence in the record).

■ Hanson has a high hurdle to overcome—we cannot say that "[a] state court's determination that a claim lacks merit" is wrong on habeas "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101, 131 S.Ct. 770 (quoting *Yarborough*, 541 U.S. at 664, 124 S.Ct. 2140). Hanson has not cleared that hurdle. While prosecutors should refrain from name-calling that might inflame the jury's passions, *see United States v. Pena*, 930 F.2d 1486, 1490–91 (10th Cir.1991), the prosecutor's statements of "two-time, cold-

blooded killer" and "murderer" were sufficiently grounded in evidence from the record. And even if these names were not grounded in evidence, they were not so egregious as to inflame the passions of the jury and thus undermine the fundamental fairness of trial. We also believe that Hanson has taken the "jackal" comment out of context. The prosecutor's full statement was, "They were going to take and they were going to take and whoever they had to burn was going to burn, because this is their world. It's a world where jackals reign. They travel in packs and they drag down the weak, and we pay the price." Tr. Trans. I, Vol. X at 1749. The prosecutor used "jackal" as an analogy— he never called Hanson a jackal.

Because the underlying claim of prosecutorial misconduct is not meritorious, trial counsel was not deficient in failing to object.

### e. Victim sympathy

■ Finally, Hanson argues that the prosecution improperly invoked sympathy for the victims. During closing arguments at resentencing, the prosecutors told the jurors to think about the extreme mental cruelty Bowles and Thurman suffered, as well as the mental cruelty that Jolanda Beesley suffered.[9] Hanson argues these statements were improper because the government never alleged the heinous, atrocious, or cruel aggravating circumstance, nor was Hanson being sentenced for Thurman's murder or the Credit Union robbery. As such, he explains, his counsel should have objected to the comments.

■ The OCCA acknowledged that it is error for a prosecutor to encourage jurors to impose the death penalty based

---

9. Beesley was a teller working at the Tulsa Federal Employees Credit Union when Hanson and Miller robbed it.

solely on victim sympathy. *Hanson II,* 206 P.3d at 1028. But it found here that the comments were probative of the likelihood of Hanson's being a continuing threat to society. *Id.* at 1029. Thus, the OCCA found the comments were not error.

■■■ "We do 'not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision.'" *Wilson,* 536 F.3d at 1120 (quoting *Moore v. Gibson,* 195 F.3d 1152, 1172 & n. 11 (10th Cir.1999)); *see also Young,* 470 U.S. at 9 n. 7, 105 S.Ct. 1038 (quoting the ABA Standard for Criminal Justice stating that a lawyer should not make arguments calculated to inflame the passions of the jury). But these comments were relevant evidence for the jury to consider and did not amount to prosecutorial misconduct. *See infra* Part II.B.i for further discussion. Moreover, this court has previously found that statements more inflammatory than these did not render a trial fundamentally unfair. *See, e.g., United States v. Chanthadara,* 230 F.3d 1237, 1274 (10th Cir. 2000) (not unduly prejudicial when victim's children ended their testimony in tears and jury viewed letters the children had written to their dead mother); *Cargle,* 317 F.3d at 1223–24 (lengthy and emotional statement from victim's sister and photos of victim while alive were not unduly prejudicial).

Because there was no prosecutorial misconduct, Hanson was not denied his right to effective assistance of counsel when counsel did not object to the comments.

### vii. Government's alleged failure to assert with specificity the predicate crime for which Bowles's murder was committed

■■■ The government alleged, and the jury found, three aggravating circumstances against Hanson for the murder of Bowles: (1) that he had a previous conviction of a violent felony; (2) that the murder was committed to avoid arrest or prosecution; and (3) that he created a great risk of death to more than one person. *Hanson I,* 72 P.3d at 45. Upon review, the OCCA struck the third circumstance. *Hanson II,* 206 P.3d at 1032–34. Hanson contends that the OCCA also should have struck the second one. He claims his trial and appellate counsels' failure to raise this issue denied him effective assistance of counsel.

The statutory aggravating circumstance that the murder was committed to avoid arrest or prosecution has two components: (1) there must be a crime separate and distinct from the murder; and (2) the defendant, in committing the murder, must have had the specific intent to avoid being arrested or prosecuted for the separate and distinct crime. *See* OUJI–CR 4–75 (2000 Supp.). Here, Hanson argues that the government never alleged with specificity which crime Hanson had committed to avoid arrest or prosecution. The OCCA found the government had established that Hanson murdered Bowles in order to avoid arrest or prosecution for Thurman's murder, making Thurman's murder the predicate crime for the purpose of the aggravating circumstance. The court based this conclusion on the government's closing argument. Thus, the OCCA held that counsel did not provide ineffective assistance for failure to raise this issue. The district court agreed. *Hanson III,* 2013 WL 3307111, at *36.

Hanson disputes the OCCA's finding. He contends that at some points during the resentencing hearing, the government alleged that the underlying crime was the assault on and kidnapping of Bowles. At other times, it was the robbery of Bowles's car. And again at other times, it was the murder of Thurman. The problem, according to Hanson, is "[a]t no time were

these theories ever narrowed to one, distinct crime." Appellant's Br. at 68.

Hanson's argument fails because there is no clearly established federal law requiring identification or unanimity on the underlying predicate crime to support the avoid-arrest-or-prosecution aggravating circumstance. *See House v. Hatch,* 527 F.3d 1010, 1021 (10th Cir.2008) ("Absent controlling Supreme Court precedent, . . . the state court could not have unreasonably applied clearly established federal law."); *see also Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) ("Given the lack of holdings from [the Supreme Court] regarding the [prejudicial effect,] . . . it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (latter two alterations in original)).

Hanson submits *Ring v. Arizona,* 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), to support his contention that the jury must find each element of the avoid-arrest aggravator beyond a reasonable doubt. *Ring* states that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact . . . must be found by a jury beyond a reasonable doubt." *Id.* But the language of *Ring* does not require Hanson's suggested result. The Supreme Court held in *Ring* that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. 2428. In *Ring,* the jury convicted Ring of felony murder, but not premeditated murder. *Id.* at 591, 122 S.Ct. 2428. Under Arizona law, Ring could not be sentenced to death for a felony-murder conviction without further findings. *Id.* at 592, 122 S.Ct. 2428. The law directed the judge to hold a sentencing hearing and to determine the pres-

ence or absence of such enumerated aggravating circumstances. *Id.* The judge did so and sentenced Ring to death. *Id.* at 594–95, 122 S.Ct. 2428. The Court reversed the sentence because the judge, and not the jury, found the facts that led to Ring's increased punishment of death, a sentence beyond the maximum authorized by a guilty verdict. *Id.* at 605–06, 609, 122 S.Ct. 2428. *Ring* requires that a unanimous jury find the *presence* of the avoid-arrest or other aggravating circumstance. But it does not speak to the facts underlying that finding. Accordingly, the holding of *Ring* is narrow. *See Lee v. Comm'r, Ala. Dep't of Corrs.,* 726 F.3d 1172, 1198 (11th Cir.2013) (stating that appellant did not point to a case where the Supreme Court extended *Ring's* holding "to forbid the aggravating circumstance being implicit in the jury's verdict"). It does not establish, clearly or not, any federal law requiring that the government prove each fact underlying each aggravating circumstance. If such a requirement exists, we must await a Supreme Court case saying so.

■ Our case law also supports the notion that the government does not need to specify the underlying predicate crime. *See, e.g., Charm v. Mullin,* 37 Fed.Appx. 475, 485 (10th Cir.2002) (unpublished) (concluding that both "the kidnapping and rape supply the necessary predicate crimes" for an avoid-arrest aggravator). A court's focus is on whether the defendant committed the murder with the "purpose of avoiding or preventing lawful arrest or prosecution." *Gilbert v. Mullin,* 302 F.3d 1166, 1181 (10th Cir.2002).[10] Whether Hanson committed one or more predicate crimes to avoid arrest seems irrelevant to the analysis.

**10.** We note that *Gilbert* was decided five months after *Ring.*

Because we hold that there is no clearly established federal law requiring the government to allege with specificity one particular predicate crime, we decline to further address Hanson's argument. Even if we agreed with Hanson's suggestion, however, we think the government adequately argued the underlying predicate crime to be Thurman's murder. As such, Hanson's trial and appellate counsel were not deficient in failing to object.

## B. Prosecutorial Misconduct

Hanson argues that there were numerous instances of prosecutorial misconduct that deprived him of a fair and reliable sentence, violating his Sixth, Eighth, and Fourteenth Amendment rights. He claims that the prosecution committed misconduct by arguing: (1) facts irrelevant to any alleged aggravating circumstance; and (2) that a death sentence was the only option to adequately punish Hanson for Bowles's murder. Did the prosecution commit errors that rendered Hanson's trial fundamentally unfair?

### i. Standard of review for prosecutorial misconduct under AEDPA

■ Prosecutors are prohibited from violating fundamental principles of fairness, which are basic requirements of Due Process. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). A prosecutor's improper remark requires the reversal of a state conviction only when it "infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868. An inquiry

into the fundamental fairness of the trial requires an examination of the entire proceedings, including the strength of the evidence against the defendant. *Harris v. Poppell,* 411 F.3d 1189, 1197 (10th Cir. 2005). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden,* 477 U.S. at 181, 106 S.Ct. 2464 (internal quotation marks and citation omitted). "Moreover, the appropriate standard of review for such a claim on [habeas] is the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (internal quotation marks and citation omitted).

■ Where the state court has adjudicated the claim of prosecutorial misconduct on the merits, we apply AEDPA's deferential standard of review. *Le v. Mullin,* 311 F.3d 1002, 1013 (10th Cir.2002). Additionally, we review the OCCA's decision of the majority of these claims for plain error because trial counsel did not make a contemporaneous objection. *See Thornburg,* 422 F.3d at 1124–25.

### ii. Arguing facts irrelevant to any aggravating circumstance

■ Hanson contends that the prosecution argued facts that did not support any of the alleged aggravating circumstances and were only introduced to garner sympathy for Bowles. Specifically, at resentencing the prosecution argued that Bowles suffered great physical anguish and/or extreme mental cruelty at the hands of Hanson, and Hanson contends this statement could only have been introduced to support the unalleged heinous, atrocious, or cruel aggravator.[11] At one point, the prosecutor said:

> torture or serious physical abuse. Torture includes the infliction of either great physical anguish or extreme mental cruelty, while physical abuse requires evidence of conscious

11. In *Spears v. Mullin,* 343 F.3d 1215, 1226 (10th Cir.2003), this court recognized that "[i]n Oklahoma, a murder is especially heinous, atrocious, or cruel if it was 'preceded by

Miller gets in the car after having just kill[ed] Jerald Thurman and tells Hanson, "You know what you've got to do now." I don't think there was any mistake in that car what was going to happen. Hanson knew what he was going to do, and of course, Mary Bowles knew what was going to happen. And the way you know Mary Bowles knew what was going to happen to her is because she started begging for her life.

Mary Bowles pleaded to John Hanson trying to stay alive. She's asking, "Is there anyone out there who loves you? Do you love anyone? You understand why you shouldn't kill me? . . .

When she pleads for her life, John Hanson smacks her in the face as he's on top of her in the back seat.

Tr. Trans. II, Vol. VI at 1180. In closing arguments, the prosecutor made comments such as: "[a]s she sits in the car, minutes away from death, focus on that"; and "[s]he's pleading for her life. And what does this defendant do? He punches her" and "[s]o the trigger is being pulled once, twice, three times, four times, five times, six times." Tr. Trans. II, Vol. XI at 1840. Defense counsel objected to three of the prosecutor's statements, and the judge sustained all of these objections (telling the jury that Bowles was the "most vulnerable," *id.* at 1890; that Hanson laid on top of Bowles for fourteen miles and felt her "frail bones," *id.* at 1892–93; and that he "smelled her hair," *id.* at 1894–95). The trial court finally reprimanded the prosecutor, telling him there was no evidence to support these comments and that the prosecutor's argument was "creating sympathy for the victim[.]" *Id.* at 1895.

The OCCA first found that the trial court's sustaining the objections to the three comments cured any error. *Hanson*

*II,* 206 P.3d at 1028. For the remaining comments not objected to contemporaneously, the OCCA on plain error review found they were not error because they were relevant in assessing Hanson's culpability. *Id.* It acknowledged that "it is indeed error for a prosecutor to encourage the jurors to impose the death penalty solely out of sympathy for the victims." *Id.* But that was not the case here. Because it was a resentencing hearing, this sentencing jury had not made the initial finding of guilt of first-degree murder of Bowles. *See id.* Therefore, the prosecutor was emphasizing the underlying facts to show that Hanson was culpable and deserving of the death penalty. *Id.* The OCCA was not convinced that the prosecutor's arguments rendered Hanson's resentencing trial unfair. *Id.* at 1028–29. The district court denied relief on the same basis. *Hanson III,* 2013 WL 3307111, at *14–15.

■■■ Hanson takes issue with the OCCA's underlying premise. He argues that it is "unreasonable to infer the resentencing jury needed to know about Ms. Bowles's mental anguish in assessing Hanson's culpability" because culpability had already been established at trial. Appellant's Br. at 79. He asserts that the prosecution's comments about Bowles's anguish only served to prejudice the jury. He relies heavily on the notion that, in capital trials, only one juror needs to be convinced that the mitigating evidence outweighs the aggravating circumstances to spare the defendant from death. *See Wiggins v. Smith,* 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). He contends that the prosecutor's comments about Bowles's suffering may have persuaded at least one juror to believe the

---

physical suffering.' " *Id.* (quoting *Romano,* 239 F.3d at 1176). The government did not

charge the heinous, atrocious, or cruel aggravating circumstance in Hanson's case.

aggravating circumstances outweighed the mitigating.

We do not find his argument convincing. Even if the prosecutor's comments were improper, which we do not think they are, we would still need to consider "whether [they] so infected the trial with unfairness as to make the resulting [sentencing decision] a denial of due process." *Neill*, 278 F.3d at 1061 (second alteration in original) (quoting *Darden*, 477 U.S. at 181). "[N]ot every improper ... remark ... will amount to a federal constitutional deprivation." *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir.2000), *cert. denied*, 531 U.S. 1055, 121 S.Ct. 664, 148 L.Ed.2d 566 (2000). When we consider the comments in the context of the entire proceeding, we do not think they were overly prejudicial. *See Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868 (evaluating the improper remarks in the context of the entire proceeding). We understand the government's concern that because this was a new jury, it had not heard all of the evidence of Hanson's guilt, and so the government felt compelled to emphasize certain facts to provide a full picture of the case to the jury.

Hanson submits *Spears v. Mullin*, 343 F.3d 1215 (10th Cir.2003), in support of his argument. In *Spears*, the court held that the admission of gruesome photographs of the dead victims to support the heinous aggravator circumstance rendered the sentencing stage fundamentally unfair. *Id.* at 1227–29 (photographs depicted numerous post-mortem stab wounds, large gash wounds, exposed intestines, swollen face and black eye).[12] We do not think these photographs are comparable to the possibly improper remarks made by the prosecutor regarding Bowles's mental state in the car.

While we would not condone a prosecutor's comments unsupported by admitted evidence, the curative instructions here would have resolved any such improprieties.[13] *See Harris*, 411 F.3d at 1197 (citing *Le*, 311 F.3d at 1013) (finding that any cautionary steps, such as instructions to the jury offered by the court to counteract improper remarks, must be considered). As to the remaining prosecutorial comments regarding Bowles's state of mind, we see no reasonable probability that Gordon's objections would have altered the outcome. We must remember that the jury had before it evidence of Hanson's callous treatment of Bowles and that the jury could independently consider what was going on in Bowles's mind during the car ride. Thus, we see no reasonable probability that the remarks infected the trial with unfairness so as to make the resulting conviction a denial of due process.[14]

12. Additionally, the photographs were offered in the sentencing phase of the capital trial to prove conscious physical suffering. The court held the photographs were not probative for that purpose because of the uncontradicted evidence that the victim had either died or lost consciousness early in the beating. *Spears*, 343 F.3d at 1227–28.

13. Hanson also contends that the trial court's sustaining defense counsel's objections was not sufficient to cure the error. But he cannot prevail on this argument because clearly established federal law says that a court typically presumes that a jury will follow instructions to disregard inadmissible evidence "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (internal quotation marks and citations omitted). Hanson has no evidence to overcome this presumption.

14. Lastly, Hanson argues that the OCCA's decision ignores the special weight that jurors give to a prosecutor's argument. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629,

### iii. Arguing death is the only option

Hanson contends that the prosecution improperly argued to the jury that death was the only option for Hanson. He claims that the prosecution presented a slide during closing argument that instructed the jurors that if they did not sentence Hanson to death, they would in essence be giving him a "freebie" because he already had been sentenced to life imprisonment. Appellant's Br. at 83. The government claims that the objectionable slide was never actually shown to the jury.

Hanson points to the case of his codefendant, Victor Miller, where the OCCA found Miller's death sentence unconstitutional in part because the prosecutors argued that death was the only sentencing option. The language at issue in Miller's case was as follows:

> But in the idea of consequences and accountability and justice under the law for Mary Bowles and Jerald Thurman, if you were to give [Miller] any punishment other than death, what would the punishment for him be? Does he get a freebie because he is already serving life plus 157 years? Yes, it's time to put a price tag on what a human life exists, because that's accountability and consequences under the law in due process in this courtroom.

*Miller v. State*, 313 P.3d 934, 996 (Okla. Crim.App.2013) (emphasis in original).

In the present case, the OCCA found that, based on the record, it could not determine to what extent the jury was actually exposed to the slide in question.

*Hanson II*, 206 P.3d at 1029. The OCCA explained as follows:

> The record shows that the prosecutor cued a slide, defense counsel objected, the judge instructed someone to turn off the projector, held a sidebar and sustained Hanson's objection. What was on the slide is not in the record before us. The prosecutor noted during the sidebar that the State had not gotten to the objectionable slide. We cannot determine on this record that Hanson was prejudiced by improper argument.

*Id.* The district court agreed. *Hanson III*, 2013 WL 3307111, at *15–17.

Hanson also challenges the prosecutor's later comment that "life with parole is not acceptable under the facts of this crime. It shouldn't be an option. The evidence is also clear that life without parole is not enough accountability for this defendant." Tr. Trans. II, Vol. XI at 1863. Defense counsel objected and the court overruled it. The OCCA found that the trial court did not abuse its discretion in overruling the objection. *Hanson II*, 206 P.3d at 1029.

Hanson contests the OCCA's decision on both the slide and the comment and insists that the prosecution's argument "directly undermined the jury's ability to give meaningful consideration to Mr. Hanson's mitigation evidence. . . ." Appellant's Br. at 84–85.

Hanson relies on a series of cases stating that a sentencer must be able to give effect to mitigating evidence in imposing the death penalty. *See Abdul–Kabir v. Quarterman*, 550 U.S. 233, 127 S.Ct. 1654,

---

79 L.Ed. 1314 (1935). The government contends Hanson cannot make this argument because he did not raise it on direct appeal. But even if we were to consider it, it would fail. The OCCA acknowledged that some of the prosecution's comments were prejudicial and sustained counsel's objections to them.

As to the remaining comments, it concluded that they were relevant to Hanson's culpability and therefore not prejudicial. We agree that the comments were not prejudicial; therefore, they could not be given special, prejudicial weight.

167 L.Ed.2d 585 (2007); *Penry v. Johnson,* 532 U.S. 782, 797, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Lockett,* 438 U.S. at 608, 98 S.Ct. 2954; *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Upon a thorough review of the record, we are unconvinced that the prosecutor's statements effectively precluded the jury from considering mitigating evidence in Hanson's case.

First, because we do not know the content on the slide at issue, and whether the jury even saw it or not, we agree with the OCCA that we cannot hold that Hanson was prejudiced by the slide.

■ Second, while we disapprove of the prosecutor's comment that it "is also clear that life without parole is not enough accountability for this defendant," we do not find it was error. For starters, the remark is not as strongly worded as the "freebie" language in *Miller. See* 313 P.3d at 996. Moreover, during its closing argument the prosecutor reminded the jury that it had a choice to make: "These are choices that you have, life without parole, life with parole, and the death penalty.... Consider what happened. Consider culpability and blame of [Hanson]. And you have these three choices." Tr. Trans. II, Vol. XI at 1859. Such comments illustrate that the prosecution was not improperly encouraging the jury to conclude that death was the only option. *See Glossip v. Trammell,* 530 Fed.Appx. 708, 732 (10th Cir.2013) (unpublished) (finding that a prosecutor's statement indicating her view that death was the appropriate punishment did not render trial fundamentally unfair because the comments were not major focus of closing, were not overly dramatic, and were followed by a statement that no matter the prosecutor's view it was the jury's views that mattered).

Thus, Hanson is unable to demonstrate that the prosecutor made an improper remark, and so he is not entitled to relief.

### iv. Totality of prosecutorial misconduct

Hanson argues that the OCCA did not consider the prosecutorial misconduct errors in total, thus failing to complete its analysis. According to Hanson, the OCCA failed to consider whether these individual instances of misconduct combined to deprive Hanson of a fair capital sentencing trial. The government contends that the OCCA did engage in an analysis of all of the possible prosecutorial misconduct. As support, it points to the OCCA's statement prefacing each misconduct sub-claim in its opinion: "In reviewing this claim, we evaluate the alleged misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel." *Hanson II,* 206 P.3d at 1028.

Unlike the government, we understand Hanson to argue that the OCCA failed to consider the alleged errors cumulatively, not that it failed to consider any of them individually. Indeed, the OCCA's language demonstrates individual consideration. Even so, Hanson still must overcome the presumption that the OCCA adjudicated this claim on the merits, even if in summary fashion. *See Harrington,* 562 U.S. at 99, 131 S.Ct. 770 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Because Hanson has failed to explain the OCCA's decision on some other basis, he has

failed to overcome the presumption. *See id.* at 99–100, 131 S.Ct. 770. Thus, we deny Hanson's claim because the OCCA's denial of the claim did not "result[ ] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). Nor would we have concluded differently had we reviewed de novo. As explained above, we disagree with Hanson that prosecutorial misconduct occurred.

### C. Invalidation of the Great–Risk–of–Death Aggravating Circumstance

 Hanson next argues that the jury's calculation of his sentence was unconstitutionally skewed by the weight of the great-risk-of-death aggravating circumstance, which the OCCA later invalidated. The Supreme Court has held that "[a]n invalidated sentencing factor ... will render the sentence unconstitutional ... *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders,* 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006) (emphasis in original). If the presence of an invalid aggravating circumstance "allowed the sentencer to consider evidence that would not otherwise have been before it," then unconstitutional error will have occurred. *Id.* at 220–21, 126 S.Ct. 884. There is no constitutional error where the facts underlying an invalid aggravator also support a valid aggravator. "That is be-

cause ... the constitutionally impermissible aggravator does not lend any additional aggravating weight to the facts and circumstances common to the aggravators." *Jennings v. McDonough,* 490 F.3d 1230, 1255 (11th Cir.2007).

In seeking the death penalty, the government alleged, and the jury found, that Hanson, "[d]uring the commission of the murder ... knowingly created a great risk of death to more than one person...." O.R. Vol. IX at 1563. The government told the jury that the aggravator was satisfied because two people were killed—Thurman and Bowles. On appeal, the OCCA invalidated the great-risk-of-death aggravator because it found that the murders of Thurman and Bowles were too greatly separated by time, distance, and intent.[15] *Hanson II,* 206 P.3d at 1033. After conducting a *Brown* analysis, the OCCA concluded that the evidence presented to the jury in support of the great-risk-of-death aggravator—Thurman's murder—was also properly admitted to support the avoid-lawful-arrest-or-prosecution aggravator. *Id.* at 1034. It held that "[u]nder the *Brown* test, Hanson's death sentence stands because his jury did not improperly consider improper aggravating evidence in deciding punishment." *Id.* The district court agreed, deciding that the death sentence was not invalid because the same facts and circumstances supporting the invalid aggravator also supported the avoid-arrest-or-prosecution aggravating circumstance. *Hanson III,* 2013 WL 3307111, at \*21–22.

---

15. The OCCA explained:

Hanson and Miller conspired to kidnap Bowles and steal her car to use in other robberies. According to Hanson, they drove her to the dirt pit intending to release her. Their plan changed when Thurman saw them. Miller killed Thurman to eliminate him as a witness and minutes later

Hanson killed Bowles for the same reason. There is undoubtedly a connection between the two murders: but for the kidnapping of Bowles, Thurman would not have witnessed the crime and been murdered. Our case law, however, requires more.

*Hanson II,* 206 P.3d at 1033.

Hanson argues the OCCA's finding is contrary to *Brown* or, at the very least, an unreasonable application of the same. He refutes the OCCA's finding on two grounds: (1) he says the prosecutor presented the evidence of Thurman's murder only to support the great-risk-of-death aggravator, giving the jury no notice of an alternative application; and (2) he says the OCCA misapplied the *Brown* test. We uphold the OCCA's conclusion, determining that Hanson's arguments lack merit.

The OCCA's determination to uphold Hanson's sentence under *Brown* is a merits determination. Accordingly, our review is subject to § 2254(d)'s deference. *Harrington*, 562 U.S. at 99, 131 S.Ct. 770.

First, Hanson misunderstands the proper inquiry under *Brown*. He contends the OCCA erred because the government never argued that evidence of Thurman's murder was being introduced for the avoid-arrest aggravator. But the question is not whether the prosecution argued the facts in support of additional aggravating circumstances, but whether the jury *may give* aggravating weight to the same facts in support of a valid aggravating circumstance. *Brown*, 546 U.S. at 220–21, 126 S.Ct. 884. Moreover, even if the question as articulated by Hanson were correct, we would find no evidence in the record to support Hanson's assertion that the government presented evidence of Thurman's murder only to support the great-risk-of-death aggravator. The record actually points to the contrary. In its closing argument, the prosecutor said, "Aggravator Three. Murder to avoid arrest and prosecution.... Once Ms. Bowles knew that Thurman was murdered, she too had to be eliminated." Tr. Trans. II, Vol. XI at 1854. Clearly, the government introduced the evidence of Thurman's murder for multiple aggravating circumstances.

Second, we reject Hanson's argument that the OCCA misapplied *Brown*.

If the presence of an invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here.... such skewing will occur ... only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor.

*Brown*, 546 U.S. at 220–21, 126 S.Ct. 884 (internal citations omitted). That is not the case here. The jury could have, and did, properly consider Thurman's murder as aggravating weight for the avoid-lawful-arrest-or-prosecution aggravator. The evidence was thus constitutionally admitted.

In sum, Hanson cannot show that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law. Rather, it was a completely reasonable application of *Brown*. Therefore, he is not entitled to habeas relief on this claim.

### D. Sentencing Phase Jury Instruction

■ Hanson argues that there was error in one of the jury instructions at the sentencing phase that denied him his Sixth, Eighth, and Fourteenth Amendment rights by forcing the jury to ignore proper mitigating evidence. Instruction No. 22 read, "Mitigating circumstances are those which, in fairness, sympathy, and mercy, *may extenuate or reduce the degree of moral culpability or blame*." O.R. Vol. IX at 1585 (emphasis added). He contends that the instruction precluded the jury from considering otherwise proper mitigating circumstances that did not go directly to his moral culpability or blame. He also avers that the prosecution "manipulated

the instruction to ensure the jurors were pressured into discarding the otherwise constitutional evidence." Appellant's Br. at 101.

On appeal, the OCCA found the instruction "did not unfairly limit the jurors' consideration of the evidence offered in mitigation in this case." *Hanson II,* 206 P.3d at 1035. The district court agreed, determining there was "not a reasonable likelihood that the jury applied Instruction No. 22 in a way that prevented them from considering any relevant mitigating evidence." *Hanson III,* 2013 WL 3307111 at *28 (citing *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190).

The Supreme Court has repeatedly held that the Constitution requires that a jury "[cannot] be precluded from considering, as a *mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Okla.,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (emphasis in original) (quoting *Lockett,* 438 U.S. at 604); *see also Hitchcock v. Dugger,* 481 U.S. 393, 394–96, 399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (reversing death sentence because Florida death penalty statute permitted jury and trial judge to consider only enumerated mitigating circumstances and nothing else). The proper inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190; *see also Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) (citing *Boyde* and noting that a state "may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving

effect to any relevant mitigating evidence").

Hanson maintains that the instruction effectively told the jury to disregard some of the proffered mitigating evidence and that the prosecution encouraged the jury to ignore such evidence. Specifically, he contends that the instruction precluded the jury from considering the testimony of the four mitigating witnesses who spoke to Hanson's character because none of that testimony "gave an excuse for the murder or reduced Mr. Hanson's culpability." Appellant's Br. at 100. Additionally, he argues that the prosecutors "manipulated the instruction to ensure the jurors were pressured into discarding the otherwise constitutional evidence." *Id.* at 101.

To support his argument, Hanson relies on the OCCA's concerns with the language of this particular jury instruction. In a case decided after Hanson's, the OCCA noted it was troubled by prosecutors "consistent[ly] misus[ing] ... the language in this instruction" to argue that mitigating evidence cannot be considered when it does not go to moral culpability or blame. *Harris v. State,* 164 P.3d 1103, 1114 (Okla. Crim.App.2007). Due to these concerns, the state produced a remedial instruction, which provided that mitigating circumstances include "circumstances which in fairness, sympathy[,] or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty." OUJI–CR 4–78 (Supp. 2008). Hanson never received the benefit of the revised instruction; thus, he argues that his jury was unconstitutionally prohibited from considering some of the mitigating evidence.

Hanson's reliance on *Harris* is misplaced. After determining that an amendment to the instruction would clarify its meaning, the OCCA "emphasize[d] that the language of the current instruction

itself is not legally inaccurate, inadequate, or unconstitutional." *Harris,* 164 P.3d at 1114. Notably for Hanson's case, it continued, "Cases in which the current [instruction] has been used and applied are not subject to reversal on this basis." *Id.*

We therefore reject Hanson's suggestion that *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), is germane. The *Mills* Court inferred from changes to a jury verdict form "at least *some* concern on the part of that court that juries could misunderstand the previous instructions as to unanimity and the consideration of mitigating evidence by individual jurors." 486 U.S. at 382, 108 S.Ct. 1860 (emphasis in original). Relying on this inference, Hanson asks us to understand the OCCA's acknowledgements in *Harris* as "tacit admissions of a fundamentally flawed instruction." Appellant's Br. at 104. The OCCA's explanation as to why it amended the instruction leads us to reject Hanson's request.

 In addition, we find the district court's thoughts on this issue instructive. The district court noted that some of the other instructions from Hanson's trial concerning mitigating evidence broadened the scope of evidence the jury could consider. *Hanson III,* 2013 WL 3307111, at *28. This is relevant because "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge...." *Boyde,* 494 U.S. at 378, 110 S.Ct. 1190 (citation omitted) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

First, Instruction No. 22 also told the jury that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." O.R. Vol. IX at 1585. This statement broadened any potential limitations imposed by the first sentence of the

instruction. Second, Instruction No. 23 listed 11 specific mitigating circumstances for the jury to consider, some of which had nothing to do with Hanson's moral culpability. These included: "[t]he defendant's emotional history"; "[t]he defendant's family history"; "[t]he defendant's history while incarcerated"; "[t]he defendant has an eleven year old son"; "[n]o direct evidence other than Rashad Barnes has been presented that the defendant ever pulled the trigger on any gun the day that Mrs. Bowles was killed"; "[t]he defendant was dominated by Victor Miller"; and "[t]he defendant is a follower." *Id.* at 1586. The instruction ended with this sentence: "In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." *Id.* Viewing the challenged instruction in the context of all the instructions, we do not think the jury would have felt precluded from considering any mitigating evidence, including the testimony of the four testifying witnesses.

Finally, we do not accept Hanson's argument that the prosecution further limited the jurors' ability to consider all of the mitigating evidence. While it is true that the prosecutor told the jury to consider whether any of the mitigating circumstances "really extenuate or reduce [Hanson's] degree of culpability or blame in this case," Tr. Trans. II, Vol. XI at 1858, the prosecutor made a number of other comments to the jury that encouraged them to consider any and all mitigating evidence they thought relevant. In its closing argument the prosecutor said, "You've heard the list and I have included all of them, but I've put emotional history, family history, prison history ... his son, that I'm-a-follower theme, that Miller dominated me. You heard those types of things. Go back, talk about those. Think about those. Make a decision." *Id.* And in rebuttal

argument, the prosecutor said, "Consider all the mitigating circumstances and you'll consider what weight [to give them.]" *Id.* at 1916. These statements demonstrate that the prosecutor encouraged the jury to consider all sorts of mitigating evidence, including the family testimony.

In light of all of the instructions and of the prosecutor's various comments, we find it hard to imagine that the jurors thought they were prohibited from considering any of the mitigating evidence they heard at the resentencing hearing. *See Boyde,* 494 U.S. at 378–86, 110 S.Ct. 1190 (concluding that the jury instruction did not violate Eighth Amendment in light of both defense evidence presented at trial on defendant's background and character and the prosecutor's never suggesting that background and character could not be considered). We conclude that there is no reasonable likelihood that the jurors applied Instruction No. 22 in a way that precluded them from considering mitigating evidence. Thus, Hanson is not entitled to habeas relief on his jury instruction claim.

### E. Cumulative Error

Hanson argues that the cumulative effect of the errors in his case influenced the "jurors' feelings, reactions, and emotions in the direction of a death sentence." Appellant's Br. at 111. According to Hanson, these errors included trial counsel's ineffectiveness, prosecutorial misconduct, a constitutionally infirm instruction defining mitigation, and circumstances to which the jurors could not give mitigating weight. Thus, the final question in this case is whether these were indeed errors, and if so, when considered in the aggregate, they deprived Hanson of a fair and reliable sentence.

When assessing whether a petitioner's sentence passes constitutional muster, we look not only at the prejudicial effect of any individual errors but also at their cumulative impact. *Cargle,* 317 F.3d at 1224. We cumulate error only upon a showing of at least two actual errors. *See Fero v. Kerby,* 39 F.3d 1462, 1475 (10th Cir.1994). "A cumulative-error analysis merely aggregates all the errors that individually have found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Workman v. Mullin,* 342 F.3d 1100, 1116 (10th Cir.2003). For Hanson to receive habeas relief, we must find that the cumulative effect of the errors determined to be harmless had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos,* 328 U.S. at 775, 66 S.Ct. 1239); *see also Malicoat,* 426 F.3d at 1263 (applying *Brecht* rule to cumulative-error analysis). This requires the petitioner to establish that the errors resulted in "actual prejudice." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710. Because the OCCA considered the merits of the cumulative error claim, we review its decision through the deferential lens of AEDPA.[16]

**16.** The government contends that there is no Supreme Court authority that recognizes cumulative error as a separate constitutional violation. This is an incorrect statement. In *Darks v. Mullin,* 327 F.3d 1001 (10th Cir. 2003), we announced that when a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because "Supreme Court authority clearly establishes the right to a fair trial and due process." *Id.* at 1017. Hanson argued that the accumulation of the errors denied him his constitutional right to a fair trial. As such, we will address the merits of his claim.

Hanson argues that an analysis of the cumulative errors in his case proves he was deprived of his constitutional right to a fair and reliable sentence. This analysis is important, he argues, because jurors determining a potential death sentence must reach a "reasoned *moral* response" using their personal interpretations of, and reactions to, the evidence presented. Appellant's Br. at 110 (emphasis in original) (citing *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). "This means that in states like Oklahoma, where death sentences must be unanimous, the feelings, reactions, and emotions of each individual juror [are] critically important." Appellant's Br. at 111. He submits Cargle in support of his proposition that a review of the errors in his case "have created such a synergistic effect" that the jurors could not reach a "reasoned moral response." *Id.* at 110 (emphasis in original) (citing *Cargle,* 317 F.3d at 1221).

The government contends that Hanson's reliance on *Cargle* is unavailing. In *Cargle,* counsel had failed to challenge two vulnerable witnesses, the prosecution had improperly bolstered and vouched for those two witnesses, and the government had a weak case totally dependent on their credibility. 317 F.3d at 1221. In effect, all of the errors revolved around the issue of the credibility of those two witnesses. *Id.* Hanson's case presents no such "synergistic" effect. *See id.*

Here, we have at most only one possible error—trial counsel's failure to investigate and present additional mitigating witnesses. Because the record did not reveal whether Hanson's counsel spoke with the additional witnesses prior to trial or not, we cannot determine whether he erred. But even assuming his decision constituted

error, we cannot engage in a cumulative error analysis absent at least two errors. *See United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir.1990) (en banc). Because Hanson has failed to prove at least two errors, we have no occasion to apply a cumulative error analysis. Therefore, we hold that Hanson has failed to establish that individual harmless errors cumulatively justify habeas relief.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the district court's decision denying Hanson's § 2254 petition for a writ of habeas corpus. We also deny Hanson's motion to expand the COA.